[PHILADELPHIA, MAY 1ST, 1841.]

McCREDY *against* JAMES and Another.

' IN ERROR.

1. If the declaration contain several counts, and there is evidence to support any one count, this court will not reverse, if the count on which judgment is rendered is good.

2. Although a declaration in assumpsit should omit to aver that the promise was made to the plaintiff, yet it may be good after verdict.

ERROR to the District Court for the City and County of Philadelphia, to remove the record of an action on the case brought. by William James and John James, copartners under the firm of Wm. & John James, against Dennis McCredy.

The declaration in the court below contained five counts.

In the first count, the plaintiff declared, that " whereas, heretofore, to wit, on the 1st day of January, 1837, one Thomas Fey shipped from Cincinnati sixteen hundred and twenty-seven kegs of lard, of which he was the owner, and consigned the same to the said plaintiffs, commission merchants at New York, who, in consideration thereof, accepted the said Thomas Fey's draughts to the amount of $6,100, and also made advances for the freight on the sixteen hundred and twenty-seven kegs of lard : that on the 7th day of February, 1837, the said Thomas Fey gave to the said defendant the following order and bill of sale, by which he transferred the sixteen hundred and twenty-seven kegs of lard to the said defendant, upon his, the said defendant's, agreeing to pay to the said plaintiffs the

amount of their acceptances of Thomas Fey's draughts, to wit, $6,100, and the freight on the sixteen hundred and twenty-seven kegs of lard, and commission for acceptances: and which order, transfer and bill of sale is to the following effect, to wit:

' Messrs. William & John James :

Gentlemen—You will please deliver to Dennis McCredy, or order, sixteen hundred and twenty-seven kegs lard, upon its arrival from New Orleans, he paying the amount of your acceptances, not exceeding 'sixty-one hundred dollars, and freight, commission on acceptances, &c.

(Signed)      THOMAS FEY.

Philadelphia, April 4th; 1837.'

And the said Dennis McCredy, the defendant, afterwards, to wit, on the 7th day of February, 1837, presented to the said plaintiffs the said order and transfer, or bill of sale to him, of the said sixteen hundred and twenty-seven kegs of lard, as above set forth, and thereupon the said plaintiffs accepted the same, and agreed to be bound thereby, and to acknowledge the said Dennis McCredy as the owner of the said sixteen hundred and twenty-seven kegs of lard, on the condition expressed in the said order and transfer, viz., of his paying plaintiffs' acceptances of $6,100, the freight and commissions on acceptances, and agreed to hold the same subject to the said Dennis McCredy's order in all respects; and the said Dennis McCredy then and there accepted to receive the said sixteen hundred and twenty-seven kegs of lard, on the terms and conditions as above expressed, viz., of paying to the said plaintiffs the amount of their acceptances of $6,100, and the freight and commissions on acceptances; and then and there agreed to, and with the said plaintiffs, in consideration of their acceptance of the said order and transfer upon them, by which they were to deliver to the said Dennis McCredy the said twelve hundred and twenty-seven kegs of lard, and to hold the same subject to his order, direction and control, to pay the said acceptances of $6,100 as they became due, and to pay the freight and the commissions on said acceptances. And the plaintiffs aver that they did then and there offer to deliver, and did deliver, the said sixteen hundred and twenty-seven kegs of lard to the said Dennis McCredy, and did hold the same from that time, to wit, the 7th day of February, 1837, subject in all respects to his direction, order and control; yet the said plaintiffs aver that the said defendant did not, nor has not, paid the said acceptances of $6,100, made on account of the said Thomas Fey, by the said plaintiffs, as they became due, or any other time since, nor since paid the freight nor the commissions on the acceptances, as he undertook and promised to do, but has altogether neglected and refused to comply with his undertakings in this respect, whereby the said plaintiffs had *to*

pay the said acceptances of $6,100, together with the freight on the said lard, to wit, on the day and year last aforesaid, at the city and county aforesaid, which, together with the commission to which the plaintiffs were entitled, amount in all to a large sum of money, to wit, the sum of $6,992; and which said sum of $6,992 the said Dennis McCredy ought then and there to have paid to the said plaintiffs, according to the form and effect of his said promise and undertaking so made as aforesaid."

The second count set forth that, " in consideration that the said plaintiffs would accept a certain order drawn on them by one Thomas Fey, in favour of the defendant, for sixteen hundred and twenty-seven kegs of lard, and which they had received as the consignees and commission merchants of the said Thomas Fey, and upon which they had a lien for the amount of certain acceptances for which they, the said plaintiffs, had come under for, and on account of, the said consignor, and on the security so furnished by the shipment to them of the said sixteen hundred and twenty-seven kegs of lard as aforesaid; in consideration that the said plaintiffs would accept the said order and consent to hold the said lard subject to the direction, order, and control of the said defendant, he, the said defendant, then and there undertook and assumed the responsibility of the payment of said acceptances so made by the plaintiffs, to the amount of $6,100, and to indemnify and save them harmless in the premises, and also to reimburse them the amount advanced for freight, and to pay them a certain commission on said acceptances. And the said plaintiffs aver that they did accept the said order, and did hold the said shipment of sixteen hundred and twenty-seven kegs of lard from that time, to wit, the 7th day of February, 1837, subject to the order and control of the said defendant, in all respects as the owner of the same; yet the said defendant did not pay the said draughts, or any of them, or save the plaintiffs harmless on account of their said acceptances as aforesaid; but the said plaintiffs had to pay the same, to wit, at the city and county aforesaid, on the day and year last aforesaid. Nor has the said defendant reimbursed the said plaintiffs the amount of freight so paid by them, or any part thereof, or the amount of the commissions to which they are entitled, but has altogether neglected and refused to comply with said agreement and stipulations as aforesaid." ·

The 3d count declared, that " one Thomas Fey, being the owner of goods then on ship board, consigned to plaintiffs, his factors, on whom divers bills of exchange had been drawn, which they had accepted at the request and for the accommodation of said Fey; and for the amount whereof to be paid when the same should respectively thereafter fall due, they were liable to the holders thereof, and on which amount they were by agreement to receive

(McCredy *v.* James.)

from said Fey a reasonable commission for accepting the same as aforesaid; a discourse was had and moved by and between said Fey and defendant, of and concerning the transfer of said goods by said Fey to defendant, then and there about to be made upon certain terms, conditions, and considerations, and for certain purposes then and there mentioned and agreed upon between them. Whereupon said defendant, in consideration that at his request said Fey did then and there accordingly transfer to him said goods as aforesaid, undertook, and then and there promised said Fey before or at the maturity of plaintiffs' said several acceptances, respectively to pay off and discharge $6,100 of the amount thereof, and to save harmless and keep indemnified said plaintiffs to that amount, and from all claims, demands, and liabilities whatsoever for or by reason thereof, also to pay to said plaintiffs the amount of freight for the carriage of said goods for said voyage, and of the commissions aforesaid, and of all other incidental charges that might necessarily be incurred and paid by plaintiffs, or payable to them in respect to said consignment and acceptances, and plaintiffs show that said goods were afterwards, on the same day and year, there delivered to said plaintiffs as consignees as aforesaid, and they were thereupon obliged to pay, and did pay a large sum of money, to wit, $500, for the freight aforesaid, and did necessarily incur and pay divers other incidental charges in respect to said consignment and acceptances, amounting to a large sum of money, to wit, $1000, and the amount of said acceptances for a sum equal to and greater than $6,100, to wit, $6,992 66, whereof part, to wit, $2,500, was due and payable heretofore, to wit, on the 25th day of March, 1837; other part, to wit, $3,400, heretofore, to wit, on the 27th day of the same month; and the residue, to wit, $872 66, heretofore, to wit, on the 14th day of the same month; and that the amount of the said commission was a large sum of money, to wit, $300; of all which said several premises said defendant afterwards, to wit, the day and year aforesaid, there had notice. Yet said defendant, his several promises in this count mentioned not regarding, did not, nor would, nor has before, or at, or since the respective maturities aforesaid of the said several acceptances, or any of them, pay off or discharge $6,100, or any part thereof, or the amount, or any portion the amount of them, or any of them, or pay any for or towards the same, but wholly refused so to do, and wholly neglected and refused to save harmless, and keep indemnified said plaintiffs to the amount of $6,100, or to any amount, from any claim, demand, or liability, for or by reason thereof, but left them wholly exposed and liable to all claims and demands in respect thereto, by reason whereof plaintiffs were compelled to pay, and did pay, the full amount thereof to the respective holders of the same. Nor has said defendant at any time paid to said plaintiffs the amount, or any part thereof, of said freight, or of said commissions, or of said charges, but the same to pay them has

hitherto wholly neglected and refused, and still does neglect and refuse."

The 4th count declared, that " one Thomas Fey, being the owner of other goods then on shipboard, consigned to plaintiff, his factors, on whom the bill of exchange hereinafter mentioned had been drawn, which they, at said Fey's request and for his accommodation, had accepted, and for the amount whereof, at their respective maturity, the said plaintiffs were liable to the holders thereof, and on the amount whereof they were by agreement with said Fey to receive a reasonable commission in that behalf; a discourse was had and moved by and between said Fey and defendant, of and concerning the transfer of said goods then about to be made by said Fey to defendant, upon certain terms, and conditions, and considerations, and for certain promises then and there mentioned and agreed upon between them; whereupon defendant, in consideration that at his request said Fey did then and there accordingly transfer to him said goods as aforesaid, undertook, and then and there promised said Fey, before or at the maturity of plaintiffs' said several acceptances respectively to pay off and discharge the amount thereof, not exceeding $6,100, and to save harmless and keep indemnified the said plaintiffs to that amount, of, and from, and against all claims, demands, and liabilities whatsoever, for or by reason thereof, also to pay said plaintiffs to the amount of freight for the carriage of said goods for said voyage, and of the commissions aforesaid, and of all other incidental charges that might necessarily be incurred in respect to said consignment. And plaintiffs show that said goods were afterwards, on same day and year, there delivered to plaintiffs as consignees thereof as aforesaid, and they were thereupon then and there obliged to pay, and did pay, a large sum of money, to wit, $500 for the freight aforesaid, and did then and there necessarily incur and pay divers other incidental charges in respect to said consignment amounting to a large sum of money, to wit, $1000, lawful money, and that over, and above, and beyond the amount of said charges their said acceptances did not exceed $6,100, but amounted to a less sum of money, to wit, $5,900. The said acceptances being of two several draughts, of which one for $2,500, according to the tenor and effect thereof, and of said acceptances thereof, became, and was due and payable on the 25th day of March, 1837, to wit, at said county; and the other for $3,400, according to the tenor and effect thereof, and of said acceptances thereof, became, and was due and payable on the 27th day of the same month, to wit, at said county. And that the amount of said commissions was a large sum of money, to wit, $300, of all which said several promises defendant afterwards on same day and year, at said county had notice; yet said defendant, his promises in this count mentioned not regarding or in any wise observing, did not, nor has, before, or at, or after the matu-

(McCredy *v.* James.)

rity aforesaid of said several accceptances, or either of them, pay off or discharge the same, or the amount thereof, or any part thereof, or pay any thing towards the same, but wholly neglected and refused so to do, and wholly neglected and refused to save harmless or keep them indemified of, and from, and against any claim, demand, or liability for, or by reason thereof, but left plaintiffs wholly exposed and liable to all claims and demands in respect thereto, by reason whereof said plaintiffs were compelled to pay, and did pay, the full amount to the respective holders of the same, to wit, the day and year aforesaid, at said county, nor has said defendant at any time paid to plaintiffs the amount of any part thereof of said freight, or of said commissions, or of said charges, but the same to pay to them has hitherto wholly refused, neglected, and still does neglect and refuse."

The 5th count was for goods bargained and sold; for the price and value of work done, &c.; for money lent; for money paid by the plaintiff for the use of the defendant; for money had and received; and upon an account stated.

The defendant pleaded *non assumpsit* and payment; upon which. issues the cause came on to be tried before JONES, J., on the 21st of January, 1840.

The plaintiff gave in evidence the order stated in the declaration, and the following. alleged acceptance, signed by the plaintiffs:

"We have accepted the order of Thomas Fey in favour of Dennis McCredy, requesting us to deliver a lot of lard, say sixteen hundred and twenty-three kegs, shipped to our address from Cincinnati, by the said Thomas Fey, and upon which lard we have accepted certain draughts for the purchase thereof, and charges on the same at New Orleans—he, Mr. McCredy, to pay us for accepting the said draughts and charges.

And we have further agreed to sell the said lard for account of the said Mr. McCredy, at four per cent. commission and guarantee, including the above commission for accepting, he placing us in funds to meet the draughts when due.

New York, Feb. 7th, 1837.          WM. & JNO. JAMES."

(On a loose scrap with the above, is the following, in the same handwriting.)

"Drafts drawn by Thomas Fey, March 22—25 2500,
    March 24—27                          3400      5900 00
Draft for charges at N. Orleans, 11—14 March,           892 96
Paid postage,                              3·00
Freight will be                          426 04     429 04
                                                  ————
                                                  $7222 00"

(McCredy *v.* James.)

A great deal of other evidence, both written and parol, was given on both sides. All that is material for the comprehension of the case, is fully stated in the charge of the learned judge; which was in substance as follows:

This action is brought to recover damages for the breach of an alleged contract. It appears that Mr. Thomas Fey, a merchant of this city, shipped 1627 kegs of lard from Cincinnati, via New Orleans, to New York, in the fall or winter of 1836, and consigned them to the plaintiffs. He drew upon them in the month of December, 1836, two bills, one for $2,500, and the other for $3,400, which the plaintiffs accepted. On the 4th February, 1837, Mr. Fey drew an order on the plaintiffs requesting them to deliver to the defendant 1627 kegs of lard, upon its arrival from New Orleans, the defendant paying the plaintiffs the amount of their acceptances, not exceeding $6,100, freight, and commissions on acceptances, &c. Three days afterwards, viz., on the 7th February, Mr. John McCredy (since deceased) presented this order of Mr. Fey, endorsed by defendant, to the plaintiffs, and took from them a paper in which the plaintiffs say they have accepted the order; he, Mr. McCredy, to pay them for accepting the said drafts. With this paper he took another, containing a statement of the amount of the draughts and charges, making together the sum of $7,222. The lard had not arrived at the time the order was presented to the plaintiffs; and no actual delivery of the lard was ever made by the plaintiffs to Mr. John B. McCredy, or to the defendant. In the paper, however, which the plaintiffs gave to Mr. John B. McCredy, there is a clause purporting to be an agreement by the plaintiffs to sell the said lard for account of the defendant, at 4 per cent. commission and guaranty, including commissions for accepting; he (the defendant) placing the plaintiffs in funds to meet the draughts when due. The lard, as it appears by a letter of the plaintiffs, dated 11th February, arrived at New York on the 8th February, the day after Mr. Fey's order was presented to them. Mr. McCredy replied to the plaintiffs' letter of the 11th of February, on the 13th of February, and a considerable correspondence followed between the parties relative to this business. It appears, also, that the lard remained unsold (at least a considerable part of it) for several months; and ultimately it was sold at prices insufficient to cover the amount of the acceptances and charges. The net proceeds to account, according to the plaintiffs' allegation, being only $5,699 05; the acceptance and charges exceeded $7,000. Such is the outline of this case, as it has been presented by the plaintiffs. In order to decide the controversy, it will be necessary to examine, with some particularity, the transaction which occurred on the 7th February, 1837, between the plaintiffs and Mr. John B. McCredy. The defendant alleges that the transaction was simply a transfer of the lard to him, subject to the plaintiffs' lien for accept-

(McCredy *v.* James.)

ances, freight, and commissions; that he acquired thereby the right to receive any balance which might be owing to Mr. Fey, after deducting the claims of the plaintiffs; but that he came under no obligation whatever to pay those acceptances, or make good any deficiency. The defendant took this ground, as you will see, in his letter of the 8th April, 1837. The plaintiffs, on the other hand, contend, that by that transaction the defendant made a contract with them, whereby he assumed the responsibility of paying these acceptances, commissions and charges, or of furnishing them with the means to do so; and inasmuch as the proceeds of the lard fell short of the required sum, they contend that the defendant is liable to them in damages, to the extent of the deficiency. Such is the dispute between the parties broadly stated. We are, then, to look into the evidence, in order to determine whether such a contract was made by the defendant as the plaintiffs allege, or whether the defendant's view of the matter is the correct one. It will be necessary, also, if you should find that John B. McCredy made such a contract as the plaintiffs say he did, to inquire and decide whether he had his father's authority to do so, or if not, whether his father afterwards confirmed or adopted his acts. The cause has been very fully discussed, and a good many questions of law made, which I am obliged to notice; and in doing so, it will be necessary to speak of facts, though I do not intend by any thing I say, to take from you the determination of any fact that is disputed. To make the case as intelligible as I can to you, I shall follow pretty much the order of the transaction, as well as the order which the counsel have adopted in their arguments; and as I proceed, I will decide the questions of law as they arise, and having explained to you the grounds of law upon which the case rests, I will then put to you, as distinctly as I can, the questions of fact, which you must determine. The first piece of evidence to which I ask your attention is the order of Mr. Fey upon the plaintiffs, in favour of the defendant. It is in the following words—(Here the judge read the order.) Now, you will observe that this order calls for the delivery of the *article itself*, and not for the proceeds of it, or the balance of the proceeds, after paying the acceptances, freight and commissions, and if it had been carried into effect according to *its very words*, what would have been done? Why, obviously this—The plaintiffs would have delivered to Mr. McCredy, (the defendant) the 1627 kegs of lard upon its arrival from New Orleans, or to some person authorised by the order of Mr. McCredy to receive it. And Mr. McCredy, on the other hand, would have paid to the Messrs. James the amount of their acceptances, not exceeding $6,100, and the freight and commissions. The order certainly contemplated such a transaction. If this had been done, it is not easy to see how any such dispute as the present could have arisen between these parties. The defendant, on receiving the lard, would have had the control of it. He would have had the power

(McCredy v. James.)

to sell it, consign it, or send it where he chose; and if he could not have sold it for so much as he had paid for it, the loss would have fallen on him, and not on the plaintiffs. Here I will stop for the purpose of saying a few words concerning this piece of evidence, taken by itself, without reference to what was afterwards done with, or under the order. It cannot be said that the *mere fact* of Mr. McCredy's having taken this order from Mr. Fey, amounted to a contract, or proof of a contract, by the defendant *with the plaintiffs,* to take the lard and pay the incumbrances. It may be that Mr. McCredy was under an obligation to Mr. Fey to present the order and take the lard, and pay off the incumbrances, or it may be that Mr. McCredy would have been entitled, as against Mr. Fey, to the balance of the proceeds of the lard in the hands of the plaintiffs, if it had been sold for more than the liens on it. We should know better how to answer these questions or suppositions, if we knew particularly the relations and transactions between Mr. Fey and Mr. McCredy. But all I need say to you on this point is, that the *mere fact* that Mr. Fey gave this order to Mr. McCredy, and that Mr. McCredy accepted it from Mr. Fey, if nothing more had been done with it, would not make Mr. McCredy liable to the plaintiffs to pay the acceptances, and pay the freight and commissions mentioned. But more was done with this order. Mr. McCredy, the defendant, endorsed it, and delivered it to his son, Mr. John B. McCredy, to take it to the plaintiffs and get them to accept it. This is proved by the testimony of Mr. Dennis A. McCredy; and this, by the way, the defendant contends was the whole extent of the authority which the defendant gave to John B. McCredy. The question of Mr. John B. McCredy's authority will come up hereafter. We are now endeavouring to show the effect of the acts of the parties, (supposing the authority of Mr. John B. McCredy was sufficient.) I come, then, to the second paper in order, viz., the plaintiffs' acceptance of this order, which is in the following words—(Here the judge read the paper referred to.) By accepting this order, the plaintiffs came under an obligation to deliver the lard according to the tenor of the order; that is to say, it amounts to an agreement by the Messrs. James to deliver to Mr. Dennis McCredy (or to such person as he should authorise to receive it) the 1627 kegs of lard, on their arrival from New Orleans, Mr. McCredy paying to them upon the delivery their acceptances, &c. This acceptance of the order, however, did not amount to a delivery of the lard. If, instead of taking this written acceptance of this order from the plaintiffs, Mr. McCredy, in person or by his agent, had demanded the lard, and had received it from the plaintiffs, but without paying at the time of the delivery their acceptances, the freight and commissions, &c., that would have been evidence of a contract by the defendant to pay the plaintiffs the sums mentioned in the order. But no actual delivery of the lard was made. In fact it had not arrived at the time the order was

accepted, according to the evidence. We are now, however, upon the question whether this writing (called the acceptance) contains any contract by the defendant to pay the sums mentioned in the order? And certainly it does not. This acceptance was wholly the act of the plaintiffs, and the words used in it are the plaintiffs' words, and not the defendant's words. The defendant must say something, or do something, that amounts to a contract in order to bind *him.* Whether there is not evidence of actings and doings by Mr. John B. McCredy, in his father's behalf, not contained in this paper, which amount to a contract, is another question to be considered hereafter. All I say at present is, that this paper, called the acceptance, taken by itself, or taken in connection with the order of Mr. Fey *merely,* does not make a contract by the defendant with the plaintiffs to pay them the sums mentioned in the order. The next piece of written evidence which I call your attention to is, the portion of this writing which follows the acceptance—which I shall call the stipulation of the plaintiffs to sell the lard for Mr. McCredy. It is in these words—(Here the judge read the portion of the paper referred to.) This I consider an important piece of evidence, not, however, because it contains the very contract of the defendant; it is the very reverse of that; it purports to contain the contract of the plaintiffs. The words used in it are the plaintiffs' words, and not the defendant's words, and the paper is signed by the plaintiffs, and not by the defendant. For aught that appears upon the face of this paper, or, I might say, of these three papers, viz., the order, the acceptance, and this stipulation to sell, (if we except the indorsement of the order by Mr. McCredy) we could not certainly know that Mr. McCredy ever had any thing to do with them. The order contains the words of Mr. Fey; the acceptance and stipulation to sell contain the words of the plaintiffs, and neither of them contains any words of Mr. McCredy whatever, excepting the endorsement of his name in blank on the order. In point of fact, however, Mr. McCredy may have had a great deal to do with them; I by no means say that he had not. He may have made a contract with these plaintiffs, of which these papers form an important part of the evidence. What I wish to be understood as saying is, that the defendant's contract, be it what it may, is not contained in either of these three papers. But to find out whether he made any contract, and if so, what it was, we must be set at large, and be permitted to look into the transaction with which these papers stands connected. The rule which has so often been referred to by the counsel, that oral evidence cannot be given of the terms of a written contract, has no application, in my judgment, to this case, at least so far as the defendant's part of the contract is concerned, whatever may be the extent to which it ought to be applied in regard to the plaintiffs' part of the contract. When the stipulations of one party to a contract are in writing, and the stipulations of the other party

are not in writing, the evidence of the contract is partly written and partly oral; and if the law does not require that the contract should be wholly in writing, it may be proved—nay it can only be proved, by showing how it was made—and to shut out the oral evidence of one half, or one side of the agreement, because the other side of the agreement is in writing, would in fact be saying that such contracts shall not be proved at all. But to proceed in the examination of this third piece of the written evidence. I reserve for the present the question, whether the defendant, by words or acts, closed in with the terms of this stipulation of the plaintiffs to sell for his account. We will suppose for the present that he did, not meaning to prejudice or prejudge the case by the supposition; and afterwards we will consider whether the evidence proves it. I observe, then, in the first place, that this stipulation of the plaintiffs to sell the lard for account of Mr. McCredy, is a matter quite distinct from the acceptance. The order and the acceptance connect three parties, Mr. Fey, Mr. McCredy and the Messrs. James. But this stipulation, or agreement, of the plaintiffs to sell, &c., on the terms mentioned (supposing it to contain terms concluded upon, and agreed to by Mr. McCredy) would be evidence of a contract between the plaintiffs and the defendant alone, and with which Mr. Fey had no connection. I mention this merely to show more clearly that, although the acceptance and this stipulation of the plaintiffs are written on the same paper, and connected in fact by the words "*and* we have *further* agreed," yet for their substance they are really as distinct as if they had been written on different papers, and at different times.

The defendant contends that this clause, or stipulation as I have called it, was a mere proffer, or offer of the plaintiffs to sell the lard upon the terms mentioned, if the defendant should not choose to take it away upon delivery to him under the acceptance. It is not for me to decide whether it was so or not. If Mr. McCredy had made himself a party to that clause of the paper, by introducing words signifying that he too had agreed that the plaintiffs should sell, &c., and then had signed it, clearly it would be much more than a proffer—it would be a bargain made and concluded between the parties. It was not necessary, however, that Mr. McCredy should have assented to it in writing, or have signed it, in order to make such a contract with the plaintiffs. And I shall refer it to you, to say, from the evidence in the case, whether or not it was a mere proffer on the part of the plaintiffs, or whether there was actually a bargain made between the plaintiffs and defendant, and the plaintiffs' part or side of the bargain only put into this writing. But assuming for the present, that a bargain was made between the parties, on the 7th of February, upon the terms expressed in this paper, (viz. that the plaintiffs should sell the lard for account of the defendant, and that defendant should pay four per cent. commission and guaranty, including the commissions for accepting, and put the plaintiffs in

(McCredy *v*. James.)

funds to meet the draughts when due.) I say, assuming that the parties mutually agreed and bound themselves by these terms, the question is what is the legal effect of it ? You observe that the order of Mr. Fey contemplated an actual delivery of the lard to Mr. McCredy. The acceptance followed the order, and as I have already said, was virtually an agreement to deliver it according to the terms of this order. But this stipulation of the plaintiffs to sell, (if it was agreed to by the defendant, so as to become a bargain between them,) proceeds upon the idea that the lard was to remain in the plaintiffs' possession to sell. Now the legal effect of such an agreement as this, coming in on the heel of the acceptance, would be to dispense with an actual delivery of the lard in pursuance of the acceptance of the order, or it would be the same as if the defendant had presented himself to receive the lard, and the plaintiffs had actually delivered it to him, and then the defendant had re-delivered the lard to the plaintiffs to sell for his account. Or we may say that the legal effect of such an agreement between the parties, made under such circumstances, would be to invest the lard with a new ownership on its coming into the possession of the plaintiffs. They would receive it as the property of the defendant, (not as the property of Mr. Fey,) subject to the lien of this new contract of the plaintiffs and defendant. If, then, you should find that there was actually a contract made between these parties, to the effect of the terms contained in this clause, (which I have called the plaintiffs' stipulation to sell,) one effect of it would be to dispense with the actual delivery, and re-delivery of the lard, and to invest it with the ownership of Mr. McCredy, and subject it to the lien of this new contract made between them. Again, as such an agreement would come in lieu of an actual delivery of the lard to the defendant, (which the plaintiffs would not be authorised to make under the order, without an actual payment of the sums mentioned in the order,) mutuality requires, and the general intent of such a transaction would appear to be, that the defendant should stand in the same relation to the plaintiffs, in respect to the incumbrances after the transfer, as Mr. Fey sustained before the transfer. In order to see this we have only to suppose the order had been actually executed, by the plaintiffs delivering the lard, and the defendant's paying on the delivery, the money mentioned in the order. How could Mr. McCredy *after that* be put in the same situation in respect to the plaintiffs that Mr. Fey had previously stood in ? Plainly, by the defendant's consigning or re-delivering the lard to the plaintiffs to sell for his account, under a contract binding himself to pay the same sums or liens that Mr. Fey was bound to pay, that is, under just such a contract as I am now speaking of. Now, as the effect of the contract is to dispense with the actual delivery and actual payment, it prevents an actual re-delivery upon consignment under such a new contract, and the *contract* must therefore be allowed to operate just as it would have operated

if it had been made upon an actual re-delivery upon consignment. Viewing the case, which the plaintiffs have undertaken to prove, in this light, there is no formal or technical difficulty in the way of their recovering in this action, provided, they have proved the necessary facts. You have heard a good deal of discussion upon questions of mere law, such as the form of the action, variance between the evidence and the counts of the declaration, and I have made these observations rather with a view to show the parties the reasons which I go upon, (and because my opinion has been requested upon law questions,) than because it was needful to trouble you with them. All that you need take the trouble to remember is, the conclusion of law upon the points controverted, and find a verdict upon the facts in accordance with the law of the case; and that you are bound to take from the court. I will now call your attention to the facts of the case. The question which I put you is this. Did the *defendant agree* with the plaintiffs that the plaintiffs should sell the lard for his account, and that he would allow the plaintiffs four per cent. commission and guaranty, including the commissions (mentioned in this paper) for accepting; and did the defendant also agree to place the plaintiffs in funds to meet the draughts when due? You have three sources of evidence for the determination of this question. (1) The papers mentioned. (2) The testimony of witnesses. (3) The correspondence between the parties. And if from the whole of this evidence you can satisfy your judgments and your consciences that the defendant made such a contract with the plaintiffs, the defendant is bound by it, and if he has broken it, he is liable to pay the damages which the plaintiffs have sustained by the breach. In considering the particulars of the evidence, your conclusions may be facilitated by a general consideration which I will now suggest to you, leaving it for you, however, to say what weight it deserves. Mr. Fey's order called upon the plaintiffs for the delivery of the very article, and for the actual payment of the acceptances, freight, and commissions on acceptances. Now is it, or is it not probable, that all the parties believed at that time that the lard was worth more than the incumbrance? Would Mr. McCredy have taken such an order, and taken the trouble to send it to New York, and get it accepted if he had not thought so? Would the plaintiffs have accepted draughts to so large an amount, if they had foreseen the actual result? Would Mr. Fey have put the condition into the order that Mr. McCredy should pay the liens of the plaintiffs, if it had not been taken for granted between them that the lard was worth more than the liens? If all parties were impressed with that belief how would they be likely to act in the business? What sort of bargain would they be likely to make? Is it or is it not fairly inferable from the evidence, from the acts of the parties at the time in question, that neither anticipated the state of the market which soon followed? I suggest then, as the object is to know what the parties *intended* by

the transaction, the consideration whether you will not be less liable to mistake their intention if you endeavour to keep in mind the state of things which existed on the 7th of February, 1837. It is not denied that Mr. Fey gave the order in question to the defendant— nor that the defendant endorsed it—nor that he delivered it endorsed to his son John B. McCredy, to take it to New York and get the plaintiffs to accept it. But it is denied that John B. McCredy had any authority to make such a contract as the plaintiffs allege he did; and it is also denied that John B. McCredy did in fact make any such contract. In order to prove the authority of John B. McCredy, the plaintiffs rely on the testimony of Mr. Reeves, Mr. Cavenaugh, and Wm. H. Creagh, and on the correspondence between the parties. The defendant has called Mr. Dennis A. McCredy to prove that John B. McCredy was authorised merely to go and get the order accepted, and bring it back accepted, and that he had no other authority. But the plaintiffs say, that admitting that he had nothing but such a special authority, still, that the defendant adopted the transaction into which he actually entered—at all events, that the defendant adopted a part of the arrangement, which they say bound him to the whole of it. You are to say then upon the evidence whether the defendant gave his son John B. McCredy authority beforehand to make such a contract, and if you should think he did not, then you will have to inquire whether he adopted his acts, what-ever they were. I will add, that the defendant could not adopt or confirm a part of the arrangement which his son made with these plaintiffs, and reject a part. He was bound to accept the whole or reject the whole. He could not adopt a part which gave him a benefit, and reject another part of it which put upon him a responsi-bility—if he wanted the benefit he was bound to take upon him-self the burthen. It is true, the parties might afterwards agree to other and different terms, but if a bargain was *actually made and concluded* between John B. McCredy, and the plaintiffs, on the 7th of February, the proposal or conclusion of the defendant, in his letter of the 13th of February, that the plaintiffs should pay them-selves out of the sales, and charge five per cent. could not rescind the contract without the assent of the plaintiffs. If, then, you should find that John B. McCredy had sufficient authority to do what he did; or if you should find that the defendant adopted his acts, or any part of them, it will be necessary then to inquire what was the arrangement or contract which he made. If you should believe that he merely obtained this acceptance, with a proposal or offer of the plaintiffs to sell the lard on certain terms, if the defendant should choose to leave it with them, it was no contract until the defendant closed in with it. The defendant's counsel put that construction on the transaction, and he refers to the letter of the 13th of February, as well as the paper itself, to prove it. The words of this paper do not, in my opinion, support his view of it. The words are, " and

we have further agreed." These are the words of the plaintiffs, it is true, and, as I have already said, by themselves they do not prove that the defendant agreed that they should so sell, and that he would so pay. To decide whether the defendant agreed we must look into other parts of the evidence. But these are just such words as the plaintiffs would have used if the bargain had been concluded; whereas, if they had intended merely an overture or offer, it would be more natural to say, we will agree, and if they had said so, we should have been obliged to consider it as an overture or proffer. Besides, the other parts of this paper may be looked to for the purpose of getting at the sense of it. Above they had said, " we have accepted the order, (which was a finished act,) and they join this clause to the acceptance by a connective " and we have further agreed to sell." Still, I repeat, it cannot be decided as a question of law from this paper alone, that the defendant had assented; and without his assent it could not be a concluded agreement. I turn now to the letter. It is an answer to the plaintiff's letter of the 11th—(Here the judge read the letter.) Now what is the alternative proposed by this paper, if it be an alternative. The one is that he will deliver the article under the order—the other that he will sell it on certain terms. This letter does not elect the first, certainly, nor does it elect the last; if it did, it would be in effect closing the bargain, which the defendant denies, but proposes a different arrangement from either. There is no evidence that the plaintiffs did expressly assent to the defendant's proposition in this letter; and if you should find that a contract had been previously made and concluded, the mere silence of the plaintiffs in reference to it, would not make it amount to a rescision. But we are now upon the question whether Mr. John B. McCredy did in fact make a contract with the plaintiffs in behalf of his father; and it is proper that I should call your attention to the plaintiffs' evidence also. They rely on the testimony of William H. Creagh— (Here the judge referred to the testimony of this witness.) If the testimony of this witness is believed, Mr. John B. McCredy did not receive this paper as a mere proffer, to take to the defendant for his acceptance or refusal, but he undertook to make a definitive arrangement of some sort. But I submit it to you, and also the question what that arrangement was. Whether it was an agreement corresponding with the plaintiffs' stipulation or agreement to sell, is for you to decide. This witness (Wm. H. Creagh) has referred to several papers, and he mentions that the charges incurred on the lard, including the acceptances, amounted to $7,222. In the defendant's letter of the 24th February, he says, "the amount to be deducted, as returned to me by you, from the gross sales, is $7,222." This letter is signed Dennis McCredy, John B. McCredy; but it is referred to and confirmed by the defendant's letter of the 18th March, which is signed by the defendant himself. These two papers (acceptance

and statement) were produced by the defendant, on notice to him by the plaintiffs, and are in evidence before you. Now, taking these papers in connection with the order of Mr. Fey, and the evidence of Mr. Creigh, you will say whether or not Mr. John B. McCredy made an agreement with the plaintiffs, comprising the terms alleged by the plaintiffs, being in fact and effect the other side of the agreement, or the counterpart of the plaintiffs agreement to sell. The rest of the correspondence may be considered as evidence not only upon the question whether a contract was made, but upon the question whether the defendant ratified or adopted it. The plaintiffs' counsel has remarked upon the fact, that in the defendant's letter of the 24th February, he uses the expression " my lard," but in his letter of the 8th April, he uses the expression " your advances to Mr. Fey on account of *his* lard;" and he has called your attention to the different states of the market at these times. The general question is, however, did the defendant by these letters confirm and approve of the act and arrangement of John B. McCredy ? Did he assert or claim property in the lard—direct about its management, under and by virtue of the arrangment made with John B. McCredy ? Or does he dissent, or discard it, and act as though he meant to have nothing to do with it ? The question is not whether, at last, he determined to throw it up, nor whether he would have liked it better, at first, if the arrangement had been different. But did he claim the benefit of the arrangement, such as it was ? Did he claim the property of the lard by virtue of it ? Did he give directions about it as his own ? If so, then he *is bound by the contract* which John B. McCredy made (if you should find that he made one.) You will have all these letters before you, and it is therefore the less necessary to refer to them. You are to decide, then, (1.) *Did John B. McCredy agree* with the plaintiffs that they should sell this lard for defendant's account, at 4 per cent. commission and guaranty, including the commission for accepting, and did he further agree that the defendant should place the plaintiffs in funds to meet the draughts when due ?

(2.) If he did, had he authority from the defendant to do so, or did the defendant adopt that arrangement in the manner stated ?

(3.) If so, have the plaintiffs fulfilled their part of the contract, and has the defendant neglected or refused to fulfil his ?

(4.) If so, then to assess the damages.

I have now put the case to you as I wish you to consider it; but some points of law have been proposed to me to answer, on both sides. I see no reason to change any thing that I have said. But in order to give the parties the benefit of these points, I will give distinct answers to such as have not already been distinctly answered.

1st. " That the words ' he paying,' &c., in the order of the 4th of February, 1837, are susceptible of being construed a mere condi-

tion, and if the jury should believe that the dealings of McCredy with Fey were merely the advancing money to Fey on the lard, then this construction is the one which should be adopted by them."

2d. "That if the words 'he paying,' &c., in the order of the 4th of February, 1837, are construed as an agreement to pay, then that agreement is with Fey, and he alone can sustain an action thereon." The dealings between Mr. McCredy and Mr. Fey, which led to the giving of the order, are not in evidence, nor are they of any importance in this case. Mr. Fey was the owner of the lard, and he might have refused to transfer it to Mr. McCredy on any terms, and therefore he might impose such terms as he saw proper; and Mr. McCredy and Messrs. James could not defeat any condition or restriction which Mr. Fey imposed. The order gave no right to the plaintiffs to deliver the lard without payment of the sums mentioned in it. As it respects Mr. Fey's right, it was a condition so far as the transaction appears to us. But if it were a promise, it would be a promise to Mr. Fey, so far as the words of the *order merely* are concerned. But if there had been an actual delivery of the article itself to the defendant, upon his demand, and the defendant had not paid the sums mentioned in the order, the *delivery* on such demand would be evidence of a contract by the defendant with the plaintiffs, to pay them the sums mentioned in the order. But there was no *actual delivery* of the very article, and of course the rights of the parties are not to be adjusted on the ground of *an actual manual delivery* of the article itself, but on the ground of *a contract between them*, as I have already stated at length.

3d. "The plaintiffs, in order to recover, must prove that the defendant contracted with them to repay them their advances."

This point is answered at length in my charge to you. You must be satisfied from the evidence that the defendant contracted with the plaintiffs to repay their advances, in the manner I have mentioned.

4th. "That the letter of the 13th day of February, 1837, directing the plaintiffs to sell the lard, and to deduct their advances from the proceeds, contains, neither expressly nor by implication, a promise by defendant to make good to the plaintiffs the difference between their advances and the proceeds of sale."

This proposition is correct. But you must remember that this letter is only a part of the evidence before you, and it is not inconsistent with such a promise. Your duty is to decide upon the whole evidence whether the defendant made such a promise or not.

5th. "An arrangement made between the parties, by which the plaintiffs, instead of delivering the lard to the defendant, according to the terms of the order of the 4th February, 1837, retain the same for the purpose of selling it, and paying the balance of proceeds, after deducting advances, &c., to the defendant, does not make the defendant liable for the difference between the proceeds of sale and

the.advances. Nor is it otherwise, even should this arrangement be construed to be a violation of Fey's order." Such an arrangement as this would not make the defendant liable for the difference between' the proceeds of sale and the advances, whether Mr. Fey's order was violated or not. But the main question in dispute is, whether the defendant did not do more than make such an arrangement? The plaintiffs say that he made a contract with them that they should sell the goods for his account, and that he would allow them 4 per cent. commission, &c., and put them in funds to meet the draughts when due.. And you must decide from the whole evidence, whether or not the defendant did make such a contract.

6th. " The words in the receipt of the 7th February, purporting that the defendant should advance money to meet the plaintiffs' acceptances, are not the contract of the defendant unless they were agreed to by his agent fully empowered to make such a bargain, or unless the defendant ratified the same."

This point I have already answered affirmatively. You must be satisfied by the evidence, that the defendant did so agree, or that he ratified it. And for this purpose, you will consider not only this· paper, but the other evidence in the cause.

7th. " There is nothing in the correspondence which can be construed to be a ratification by the defendant of so much of the paper of the 7th of February, 1837, as is supposed to contain an agreement by the defendant to reimburse the plaintiffs their advances, or to put them in funds to meet them."

There is nothing in the defendant's correspondence that ratifies specifically or explicitly an agreement to reimburse the plaintiffs' advances, or put them in funds for that purpose. But that was not necessary. Nor is it the question whether this particular part was by express words confirmed. The question is, as I have said already, did the defendant adopt the transaction—treat it as a thing done— claim the lard as his own.by virtue of it? If so, he cannot discard that part of the arrangement which subjected him to this liability, if such a liability was a part of the arrangement, if his son agreed, to wit, to the terms contained in the plaintiffs' stipulation to sell.

8th. " The paper of the. 7th of February, 1837, is to be construed to contain alternative propositions, either, 1st. To deliver the goods on their arrival to the defendant in specie ; or, 2d. To retain them for sale, and account of their proceeds to defendant. And that the defendant had, until the arrival of the goods and notice of that fact, to make his option between the alternatives."

The paper referred to in this point is to be taken in connection with the other evidence. Upon its face it does not purport or appear to be an alternative proffer. But if the other evidence shows that it was given and received as such, you ought so to hold it. But if you think from the whole evidence that a bargain was

made and concluded between the plaintiffs and defendant, through John B. McCredy, and then this paper was given by plaintiffs as evidence of their part of the bargain, then it should not be received by you as a proffer merely, but as an agreement, and the defendant would have no option, nor could he rescind such bargain without plaintiffs' assent to the recision.

9th. " That he who has the choice of an alternative, may make the determination of that election the subject of bargain; and the fixing upon one of the alternatives, rather than the other, is a good consideration whereon to found a contract." ·

This depends on the last, and has no application to the case, if you should find that the parties made and concluded a bargain on the 7th February, as already stated.   Yet if the plaintiffs made two offers to the defendant, allowing him his choice, there would be no bargain until the choice was made, and up to that time the plaintiff might withdraw either.   But upon the defendant's closing in with either, the bargain would be made, and the parties bound.  In regard, however, to the acceptance, the plaintiffs could not rescind or withdraw that. That, therefore, was not a mere proffer.   And whether the plaintiffs' stipulation to sell was a mere offer or a bargain, you will decide.   I refer you to the testimony on this point, and particularly Creagh's.

10th. " Should it be determined that the original agreement of the parties was such as the plaintiffs contend for, then it follows that the defendant, by his letter of the 13th of February, 1837, proffered a new bargain to the plaintiffs, at an increased commission.  This new bargain confined the plaintiffs' resort for the reimbursement of their advances to the proceeds of the lard.   That the plaintiffs by their silence, or by their confirmatory words, in their letter of the 27th of February, 1837, accepted the terms of this new bargain."

If you should find the original agreement as stated in this point, the offer by the defendant, in his letter of the 13th, at an increased commission, would not destroy or affect the bargain previously made, unless the plaintiffs closed in with the terms, and the silence of the plaintiffs as to the new offer would not be evidence from which you could infer their assent to rescinding the former contract, and closing in with this new offer.   Nor would the plaintiffs be obliged in that case to resort to the proceeds of the lard, or rather they would not be confined to them, and be bound to lose the difference between the proceeds and the advances.   There are no words confirmatory of such new bargain in the plaintiffs' letter of the 27th.

11th. " That there is no parol proof in the cause of any contract by the defendant to pay moneys to the plaintiffs."

There is parol evidence before you of a contract by the defendant to pay money to the plaintiffs; but whether the evidence is sufficient to prove such contract, does not belong to me to decide.   But you will pass upon that question.

(McCredy v. James.)

The jury found for the plaintiffs; and the defendant took a writ of error and filed the following specifications:

" 1. The court erred in admitting the paper of February 7, 1837, it not being applicable to the issue upon any count in the declaration.

2. The court erred in charging the jury that there was evidence to sustain the issue for the plaintiffs in this cause.

3. The court erred in charging the jury that the silence of the plaintiffs in regard to the contents of the letter of 13th February, 1837, from the defendant to the plaintiffs, was not evidence of assent to the proposals contained in that letter.

4. The court erred in charging the jury in regard to the construction and effect of the letter of 15th February, that it was an acceptance in part, and a rejection in part of a certain arrangement pretended to have been made on the 7th February preceding, between the defendant's agent and the plaintiffs.

5. The court erred in charging the jury that there was a reference in the letter of the 18th March, to the proposed arrangement of 7th February.

6. The court erred in charging the jury that if the defendant by his correspondence with the plaintiffs, asserted or claimed a property in the lard, and directed its management, and gave directions about it as his own, he thereby affirmed the supposed arrangement of 7th February.

7. The court erred in charging the jury that there was no evidence of dealings between defendant and Fey, which led to giving of the order of 4th February, nor if there were, as said, would it be of any importance in the case.

8. The court erred in charging the jury that if there had been an actual delivery itself to the defendant, on his demand, and the defendant had not paid the sums mentioned in the order, the delivery on such demand would be evidence of a contract by the defendant with the plaintiffs to pay them the sums mentioned in the order.

9. The court erred in the 7th point propounded by the defendant, by answering in substance that the correspondence contained by implication, though not expressly, a ratification of the supposed arrangement of 7th February, 1837.

10. The court erred in their answer to the 9th point propounded by the defendant.

11. The court erred in their anwer to the 10th point propounded

(McCredy v. James.)

by the defendant, by charging the jury in answer thereto, that there was nothing in plaintiffs' letter of 27th February.

12. The court erred in their answer to the 11th point propounded by the defendant, by charging the jury in answer thereto, that there was parol evidence of a contract by defendant to pay money to the plaintiffs.

13. The court erred in their answer to the 2d point propounded by the plaintiffs, by charging the jury in answer thereto, that the letter to the plaintiffs from the defendant contained a reference to the writings of 7th February.

14. There is error in the first four counts of the said declaration, inasmuch as they contain no cause of action.

15. There is error in the first count of said declaration, inasmuch as it avers a past consideration, and does not aver any preceding request of the defendant. The promise therein set forth is a mere *nudum pactum.*

16. The second count of the said declaration does not aver that the promise and undertaking therein set forth was made to the plaintiffs.

17. None of the counts in this declaration contain any averment of notice to the defendant of the amount of the commissions, nor of the maturing of the acceptances, nor of any request made to the defendant to pay all or any part of the sums so claimed by the plaintiffs.

18. There is no venue laid in any of the counts of the said declaration but the last.

19. The first and second counts of the said declaration aver no sufficient consideration for the promise therein alleged by the defendant to have been made to the plaintiffs, inasmuch as the acceptances and agreements therein stated to have been made by the plaintiffs to the defendant, confer no other rights upon the defendant than such as he already had by the order of Thomas Fey.

20. That the only consideration alleged in the said declaration for the premises, is not a valuable or good consideration. The acceptances of the order therein stated being nothing more than an acknowledgment that he had received notice of it: and the said declaration not averring that the plaintiff received or obeyed orders in consequence of said acceptances, which he would not have been bound to receive or obey if emanating from Thomas Fey himself, and the power of substitution to his own rights resided in Thomas Fey, independently of any concurrence of said plaintiffs.

(McCredy *v.* James.)

21. There is no averment in this declaration, that the plaintiffs discharged Thomas Fey, which would have been a consideration for the defendant's promise; nor can it be inferred from any of the averments contained in the narr.; nor, if capable of being inferred, would an inferential consideration sustain the action." ·

The case was argued by Mr. *Haly* and Mr. *F. W. Hubbell* for the plaintiff in error, and by Mr. *Holcomb* for the defendants in error.

The opinion of the court was delivered by

Rogers, J.—Several exceptions have been taken to the charge of the court. But without entering into a detailed examination of each item, it may be sufficient to remark, that we see nothing of which the plaintiff in error has any right to complain. The charge contains an accurate statement of the case; the law is clearly and distinctly laid down; the facts are left to the jury; and if the case called for the expression of an opinion, there would be no great difficulty in showing that the evidence warranted the verdict. The plaintiff complains of the admission of the paper of the 7th February, 1837, because, as he says, it was not applicable to the issue on any count of the declaration. But in answer to this objection, it is truly said, that it is evidence of the allegation in the first count, that the defendant promised to pay the acceptances as they became due, and the freight and commissions on the acceptances. The evidence on that point is partly in parol and partly in writing; of which the letter of the 7th February is an important item.

The judgment was entered on the first and second counts, and on the count for money paid. Whether the evidence would support the count for money paid, would perhaps, under the authority cited, admit of serious doubt. It is, however, not necessary to determine this point, for if there is evidence on any one of the counts, there is no reason to reverse the judgment, provided all the counts are good on which the judgment is rendered.

But it is said that two of the counts are bad, for several reasons, the principal of which are, first, because there is no consideration; and, secondly, because they omit to name the promissor, and to allege that the promise was made to the plaintiff. In the latter respect, the declaration is informal, and would have been bad on special demurrer; but after verdict, it is good enough, particularly in this state, where amendments are so much favoured. Had the errors been pointed out, the declaration would have been amended on the spot, and it does not (except in some very rare instances) advance the cause of justice to permit the party to lie by and reverse the cause, for an error which, if pointed out at the time, would have been remedied immediately. It is not, it is true, distinctly alleged, yet the implication is strong that the plaintiff was the promisee, and that the promise was made to him.

(McCredy *v.* James.)

But was there a consideration for the promise ? The allegation that the plaintiff accepted the order to deliver the lard to the defendant, and agreed to be bound by the order, and to acknowledge him as the owner of the lard, on condition of paying plaintiffs' acceptances, the freights and commissions on acceptances, and agreed to hold the same subject to his order, in all respects, is, in the opinion of the court, a good and present consideration. It was a benefit (of which the agent of the defendant appeared to be very sensible) to the defendant to have the entire control of the property; and this he was not entitled to have, except by a compliance with the order, which contains express stipulations on the subject, by payment of the acceptances, &c., or which the parties under another arrangement chose to consider as equivalent, a promise to pay them by the defendant, and to furnish funds therefor, as they became due. There is no averment in the declaration that the plaintiff released Fey; but if necessary, perhaps this might be inferred after verdict. Be this as it may, there is a good consideration stated without such averment. We view the arrangement which took place as equivalent to an actual delivery. After the arrangement, they stood in relation to each other as factor and principal.

It must be admitted, that in many respects the declaration is informal and defective; but as a title is set out, the defects are cured by verdict.

Judgment affirmed.